*Notice:* This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@appellate.courts.state.ak.us.

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| SANDY M., | ) | |
| | ) | Supreme Court No. S-15350 |
| Appellant, | ) | |
| | ) | Superior Court No. 3KN-11-00039 CN |
| v. | ) | |
| | ) | |
| STATE OF ALASKA, | ) | MEMORANDUM OPINION |
| DEPARTMENT OF HEALTH & | ) | AND JUDGMENT* |
| SOCIAL SERVICES, OFFICE OF | ) | |
| CHILDREN'S SERVICES, | ) | No. 1511- July 16, 2014 |
| | ) | |
| Appellee. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Kenai, Charles T. Huguelet, Judge.

Appearances: Jennifer K. Hohnstein, Office of Public Advocacy, Anchorage, for Appellant. Seth M. Beausang, Assistant Attorney General, Anchorage, and Michael C. Geraghty, Attorney General, Juneau, for Appellee.

Before: Fabe, Chief Justice, Winfree, Stowers, Maassen, and Bolger, Justices.

1.      Sandy M. has a long-term, documented history of mental health and substance abuse issues.[1]  Sandy appeals the termination of her parental rights to her youngest child, Henry.  Sandy's sole argument on appeal is that the trial court erred

---

\*      Entered under Alaska Appellate Rule 214.

[1]      We use pseudonyms to protect the family's privacy.

when it determined that the Office of Children's Services (OCS) made reasonable efforts to enable her child to return home.[2]

2. OCS assigned a case worker to Henry's case in July 2011, soon after he was born. The case worker developed a case plan that recommended Sandy participate in substance abuse evaluations, submit to random urinalysis tests, and undergo mental health assessments. Sandy's use of the proffered services was sporadic, at best; she missed several urinalysis appointments, and there is no record of mental health or substance abuse assessments. The case worker removed Henry from Sandy's home in September 2011.

3. Soon thereafter, Sandy reported she had missed a mental health appointment due to being incarcerated, had failed to reschedule that appointment, and had not been taking her prescribed "antidepressants but had been giving them to [Henry's father] because that made his behavior better." On September 26, Sandy underwent a hair test, which yielded positive results for amphetamine and methamphetamine. On September 29, Sandy gave a dilute urinalysis sample — her first urinalysis since August 22. On October 10, Sandy's urinalysis was dilute but positive for amphetamine. At that point, the case was reassigned to another case worker. The new case worker worked with Sandy to develop an updated case plan, which provided for Sandy to participate in dialectical behaviorial therapy and mental health counseling, complete a substance abuse assessment, and continue random urinalysis.

4. Sandy underwent a comprehensive mental health assessment with mental health provider Terry Grondahl in October 2011. The case worker testified that, at the time of that assessment, she had just been assigned to the case and had not yet been able to provide certain collateral information to Grondahl. As a result, Grondahl needed

---

[2]    *See* AS 47.10.086.

at least three more sessions with Sandy before he could provide treatment recommendations or refer Sandy for services. After receiving updated collateral information from the case worker, and seeing Sandy for two therapy sessions, Grondahl still felt more visits with Sandy were necessary for further assessment and recommendations. By the time of the adjudication hearing on January 30, 2012, Sandy had only seen Grondahl those two times because of a lack of "follow through on" her part.

5.    On December 21, 2011 Sandy displayed odd behavior during a visit with Henry and later that day her urine tested positive for oxycodone. Soon after, Sandy was arrested and incarcerated for approximately two weeks. Sandy also admitted to drinking at a holiday party, and by the time of the adjudication hearing, Sandy had still not obtained a substance abuse assessment as recommended by her case plan.

6.    Following the adjudication hearing, the superior court issued an order finding that Henry was a child in need of aid. From January to June 2012, Sandy's urinalysis participation was very sporadic, and when she was tested the sample was often dilute. In February 2012 Sandy acted very strangely during a visit with Henry. The case worker felt, on this occasion, that "[s]omething was off" and asked Sandy to complete a urinalysis. Sandy failed to do so, and as a result the superior court, at the termination trial, presumed Sandy was under the influence at that time. Sandy underwent a substance abuse assessment at the Cook Inlet Council on Alcohol & Drug Abuse (CICADA) on February 28, 2012; outpatient treatment was recommended to address Sandy's diagnosis of alcohol and opioid dependence and amphetamine abuse. Sandy did not comply with the recommendation.

7.    Sandy saw Terry Grondahl five times over the period of March to May 2012. She then received no mental health treatment until she began seeing a new provider, Colleen Nusbaum, in August 2012. Nusbaum conducted an updated mental

health assessment and recommended that Sandy undertake psychological testing, individual therapy, and group therapy. Two therapy groups were specified: group dialectical behavioral therapy for borderline personality disorder and a women's post-traumatic stress disorder group.

8. In mid-August 2012 Sandy returned to CICADA, where she was informed that she would need to undergo a new substance abuse assessment because so much time had passed since her last one in February 2012. Sandy completed the new assessment on August 19, 2012. The assessment continued to recommend outpatient treatment, reflecting little change from the February assessment.

9. In September 2012 "there was another gap of services." In mid-October, Sandy, her attorney, and her case worker met for a status update. Sandy indicated "she was waiting to hear from CICADA," so they discussed contacting a different provider, Nakenu Family Center. Sandy reported that she was attending her therapy sessions, but the case worker testified there was in fact a "gap" in Sandy's individual therapy attendance. Indeed, the record shows Sandy attended only one session between August 2012 and February 2013.

10. Henry's father started treatment at CICADA in October, and this created a conflict of interest for CICADA in relation to Sandy's treatment. From July 2012 through February 2013 Sandy took 20 urinalysis tests, of which four were negative, 12 were dilute, two were dilute but positive for opiates, and two were positive for opiates. Sandy was arrested on November 7. On December 5, Nakenu informed the case worker "that due to [Sandy's] recent arrest and ongoing dilute UAs . . . she wouldn't qualify for their program." Nakenu recommended Sandy enter inpatient treatment at Serenity House.

11. There was about a week's delay for the case worker to obtain purchase authorization for the inpatient program, and then Sandy completed an updated

substance abuse assessment for Serenity House on December 19. The assessment recommended a medium intensity residential treatment program. Sandy later testified at her termination hearing that during the assessment she lied about the level of her addiction because she wanted to be referred to a long-term program that Henry could attend with her.

12. In March 2013 Sandy's case worker called a meeting to discuss what had become a pattern of dilute unrinalysis samples. At the meeting, Sandy reported she had filled out applications for two different inpatient programs. The case worker offered to send the application packets out for Sandy, but Sandy refused and ultimately did not send them until late April or early May 2013. In early May the case worker was replaced by a third assigned OCS case worker. The new case worker spoke with Sandy on May 16, and Sandy reported she had not engaged in any mental health services for the two weeks prior "because she had gotten too busy." The case worker testified at the May 28, 2013 termination hearing that Sandy had never attended any of the recommended mental health therapy groups.

13. After the termination hearing, the superior court issued a written order terminating Sandy's parental rights to Henry. Sandy moved for reconsideration, arguing that OCS did not make reasonable reunification efforts. The superior court denied Sandy's motion for reconsideration, and Sandy now appeals to this court.

14. We have held that "the requirement that the state offer reunification services is fulfilled by setting out the types of services that a parent should avail himself or herself of in a manner that allows the parent to utilize the services."[3] "Where services have been provided and a parent has demonstrated a lack of willingness to participate or

---

[3] *Frank E. v. State, Dep't of Health & Soc. Servs.*, 77 P.3d 715, 720 (Alaska 2003).

take any steps to improve, this court has excused minor failures by the state and rejected arguments that the state could possibly have done more."[4] Here, Sandy argues OCS failed in three ways to provide reasonable efforts.[5]

15. Sandy's first argument is that OCS failed to interface Sandy's mental health and substance abuse providers and that this failure led to improper recommendations for outpatient treatment. But Sandy's 2012 substance abuse assessments from CICADA both indicate that the assessing providers were aware of Sandy's mental health problems.

16. The February 2012 assessment states that Sandy was then seeing a counselor for "anger and emotional issues" and that she had been required by OCS to undergo a mental health assessment during the course of Henry's case. It also states Sandy "[m]ay need to have mental health issues addressed" and "[h]as past [emotional] traumas that are significant in recovery." The assessment also acknowledges Sandy's borderline personality diagnosis and states "[h]er mental health will be observed while in treatment and appropriate referral will be created if deemed necessary." Finally, the assessment states it is based on information from an OCS collateral report, previous treatment records, and several other sources. One of those sources is referred to as an "ASAP Report" from 2009, which is almost certainly a reference to the May 2009 combined substance abuse and mental health assessment which, was also performed by

---

[4] *Ben M. v. State, Dep't of Health & Soc. Servs.*, 204 P.3d 1013, 1021 (Alaska 2009).

[5] "We review the trial court's factual findings for clear error and its legal determinations de novo." *Simone H. v. State, Dep't of Health & Soc. Servs.*, 320 P.3d 284, 288 (Alaska 2014).

CICADA.[6] The August 2012 assessment also notes Sandy's mental health issues: "Her mental health will be monitored while in substance abuse treatment and appropriate referral made as necessary."

17. But Sandy never began the recommended outpatient treatment, and there is no evidence that she would have engaged with inpatient services had they been recommended earlier. Indeed, by the time of the termination trial Sandy was insisting that she did not have a substance abuse problem at all.

18. Sandy additionally argues that her case plans were not reasonable because they did not follow recommendations which were designed to "illuminate" her treatment needs. Sandy points to mental health provider Terry Grondahl's initial assessment, which tentatively recommended that Sandy undergo a psychiatric assessment and a brain injury evaluation. There is no evidence in the record that Sandy ever received either of those services.

19. Grondahl indicated to the assigned case worker that "he . . . want[ed] to see [Sandy] on at least three more occasions before really being able to thoroughly provide recommendations," but Sandy failed to timely complete those sessions.[7] Thus, not only were the recommendations for the brain injury evaluation and psychological testing merely preliminary, they were also contingent on cooperation from Sandy in the form of engaging in individual therapy before such recommendations could be finalized.

20. Sandy also points to the August 2012 mental health assessment from Colleen Nusbaum, which recommended "psychological comprehensive testing" as well

---

[6]    That 2009 assessment lists "ASAP" as its "Referral Source."

[7]    As noted above, by the time of the adjudication hearing Sandy had only seen Grondahl for two therapy sessions. Sandy did see Grondahl five times, months later in the spring of 2012, but then stopped attending therapy altogether for a period and ultimately began with a new therapist — Colleen Nusbaum — in August.

as individual and group therapy. But Sandy failed to engage with the services Nusbaum recommended. Sandy attended only one therapy session between August 2012 and February 2013 and never attended the recommended mental health therapy groups. Sandy testified at the termination hearing that she was too busy to attend group therapy and denied needing any mental health services at all.

21. Sandy argues that comprehensive psychological testing was necessary in order to obtain the "more in-depth information" needed to properly treat her mental health and substance abuse problems in a cooperative, dual treatment plan. That is, "[b]y refusing to obtain the proper foundational information to effectively create a working plan, OCS failed throughout the totality of this case to provide reasonable efforts." She thus implies that her case plans have never been sufficient because they have not had the benefit of all necessary "foundational information" in the form of psychological test results.

22. But Sandy refused to engage consistently with the recommended mental health services. She failed to attend the sessions Grondahl required in order to make comprehensive treatment recommendations. And she failed to attend the therapy sessions recommended by Nusbaum in the same assessment in which comprehensive psychological testing was suggested.

23. Sandy's final argument is that "OCS failed to allow [her] the opportunity to properly utilize substance abuse treatment when it did not send sufficient collateral information to providers." Sandy asserts that in 2012 "CICADA lacked access to essential information that would have fundamentally altered [its] assessment[s]." She correctly notes that at the time of the February assessment CICADA was unsure of Sandy's last substance use, but admits OCS had informed CICADA of a September 2011 urinalysis that was dilute but positive for methamphetamine. OCS also informed CICADA that Sandy was taking prescribed opiates, and the assessment notes that the

urine sample Sandy provided on the date of that assessment was dilute. Sandy assumes OCS did not provide CICADA with Sandy's urinalysis records, but she does not point to any evidence to support this claim.

24.     Sandy similarly finds fault with the August 2012 assessment, asserting that it lacks "any account of the stream of positive and/or dilute [UAs] that were still flooding in or any of the mother's heightened mental health issues over the summer." But the assessment states Sandy's mental health would be monitored and treated as appropriate throughout the recommended outpatient program. And again, CICADA was aware that Sandy was taking prescribed opioids. Thus, even assuming CICADA did not have access to the urinalysis records, CICADA was aware that Sandy was in fact an active drug user.

25.     Regardless of the quality of Sandy's assessments, she never entered the recommended outpatient program, and by the time of the termination trial she had not entered any inpatient program. Despite overwhelming evidence to the contrary, Sandy testified that she did not have a substance abuse problem. Any failure on OCS's part to provide collateral information is irrelevant because Sandy refused to engage in any treatment program at all.

26.     We AFFIRM the judgment of the superior court terminating Sandy's parental rights.